# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MARY POZNAK,**

        Plaintiff,

    -vs-                                     Case No. 11-C-618

**THE PNC BANK CORP. AND AFFILIATES
LONG TERM DISABILITY PLAN,**

        Defendant.

## DECISION AND ORDER

This ERISA action for the recovery of benefits pursuant to a long-term disability plan comes before the Court on cross-motions for summary judgment. For the reasons that follow, defendant's motion is granted, plaintiff's motion is denied, and this matter is dismissed.

**Background**

The plaintiff, Mary Poznak, worked as an Asset Manager II - Residential for the Realty Services division of PNC Bank. As an Asset Manager II, Poznak's job responsibilities included monitoring marketing plans and marketing efforts, tenant eviction proceedings, negotiating lease agreements, preparing real estate closing documentation, and maintaining computer records for properties.

As a PNC Bank employee, Poznak was entitled to coverage under the PNC Bank Corporation and Affiliates Long Term Disability Plan (the Plan). The Plan provides full-time, salaried employees who are out of work for longer than ninety (90) days with long-term

disability ("LTD") benefits of up to 70% of their base salary. Pursuant to the Plan, PNC entered into an Administrative Services Agreement with Sedgwick Claims Management Services, whereby PNC delegated its discretionary authority to determine eligibility for LTD benefits under the Plan.

Under the Plan, Total Disability and Totally Disabled mean that, for the first 24 months of Total Disability (including a 90 day elimination period), the employee "cannot perform each of the material duties of his or her regular occupation" because of Injury or Sickness, and "requires the regular attendance of a physician." After 24 months, the "any gainful" occupation section of the Plan governs a claim for benefits. To be eligible under that section, the employee is required to demonstrate that she could not perform each of the material duties of any gainful occupation for which she was reasonably fitted by training, education or experience. LTD benefits cease on the earliest of the date that Total Disability ceases, the date that the Participant fails to provide proof of Total Disability, or the date that the employee ceases employment. It is the employee's responsibility to submit information to establish Total Disability and, thus, her entitlement to LTD benefits under the Plan.

In January of 2007, Ms. Poznak was diagnosed with breast cancer. In her application for disability benefits, Poznak reported her disability as breast cancer with modified radical mastectomy. Plaintiff reported that her treatment caused her to have a compromised immune system, which, in turn, caused her to experience "recurrent and varied infections." Plaintiff also experienced side-effects from chemotherapy, which she included as excessive fatigue and nausea, problems with sleeping, muscle and bone pain, and a temporary decrease in

concentration. While she reported that she was able to leave her home without help, plaintiff noted that she was unable to drive and could not leave the house alone on the days she received chemotherapy. Over the course of her treatment, plaintiff has seen the following doctors: Dr. Amar Khurana (primary care); Dr. Priya Rostagi (oncology); Dr. John Hyland (radiation oncology); Dr. Kenneth Shestak (plastic surgery); and Dr. Sudhir Malik (neurologist).

By letter dated June 19, 2007, Sedgwick acknowledged plaintiff's application for LTD benefits. Sedgwick informed plaintiff that, in order to remain eligible for benefits, she must continue to meet the applicable definition of disability. On July 13, 2007, Sedgwick approved Poznak's claim for LTD benefits. Sedgwick informed plaintiff that it would need to verify her ongoing eligibility for benefits on a "periodic basis." "We will be requesting information from you and your attending physicians. Please ensure that the necessary information is submitted on a timely basis to avoid any possible delay in your future benefit payments."

In May of 2010, Sedgwick requested an independent review of plaintiff's LTD claim file by an independent examiner to determine if plaintiff had any current restrictions or limitations that prevented her from working. On or about May 25, 2010, plaintiff's complete LTD claim file was sent to Network Medical Review ("NMR"), an independent third-party, who, in turn, arranged for plaintiff's claim file to be reviewed by two independent physicians through Elite Physicians, Ltd..

On June 1, 2010, Dr. Nelson Chao, who is board-certified in Oncology and Internal Medicine, as well as Professor of Medicine and Immunology at Duke University, completed his review of plaintiff's LTD claim file. As part of his review, Dr. Chao spoke with Dr. Shestak on May 27, 2010. During their conversation, Dr. Shestak reported that he felt that plaintiff needed to remain out of work due to "some discomfort" caused by tissue expanders. Dr. Chao noted that plaintiff was diagnosed with mutifocal infiltrating ductal carcinoma in her right breast, and that she underwent surgery in February, 2007. Dr. Chao also noted plaintiff's subsequent treatment with chemotherapy and radiation. Lastly, Dr. Chao noted that plaintiff "has been free of any disease since the time of her surgery." Based on his medical review and his conversation with Dr. Shestak, Dr. Chao found that there was "no evidence . . . from an oncology standpoint, that would suggest the [plaintiff] is unable to work." While Dr. Chao noted that repetitive movement of her right arm might be a concern because of the mild lymphedema that plaintiff experienced following her surgery, he found that this did not preclude plaintiff from working. Rather, Dr. Chao felt that plaintiff should only have the restriction that she not pull more than five (5) pounds with her right arm and have no repetitive motion of the right arm.

On June 1, 2010, Dr. Michael Wheatley, who is board-certified in Plastic Surgery, also completed a review of plaintiff's LTD claim file. Dr. Wheatley was unsuccessful in his attempt to speak with Dr. Shestak. However, he did speak with a member of Dr. Wheatley's staff, who was able to confirm that plaintiff had not had the second phase of her elective, implant surgery. Dr. Wheatley noted that plaintiff underwent placement of a latissimus flap

-4-

Case 2:11-cv-00618-RTR   Filed 06/11/12   Page 4 of 16   Document 61

and tissue expander in 2008, as well as a revision to the latissimus flap in April, 2009. He also noted that plaintiff completed the tissue expansion process, but that her expander had not yet been converted to a permanent implant. Specifically, Dr. Wheatley noted that plaintiff's last surgery was over one year ago, in April of 2009. Based on the information available to him, Dr. Wheatley opined that there was no objective medical information, from a plastic and reconstructive surgery standpoint, that would support plaintiff's inability to work. Dr. Wheatley further opined that plaintiff's condition was stable, and there were no restrictions on her ability to work from a plastic and reconstructive surgery standpoint.

On June 10, 2010, plaintiff's claim file, including her Training, Education and Experience ("TEE") Statement, was referred to Intracorp, an independent third-party, for a transferable skills analysis ("TSA"). As indicated in her TEE statement, plaintiff has a high school education, holds a real estate license, and has worked in banking since 1973. Prior to her employment with PNC, plaintiff worked as a lender and managed problem loan portfolios for twenty-six (26) years. Based upon plaintiff's education, employment experience, and the limitations/restrictions imposed by Dr. Chao, Intracorp was able to identify eight (8) occupations readily available in the Pittsburgh, PA area for which plaintiff was qualified. These occupations included numerous positions in the real estate and title search fields, or in a financial institution setting – such as loan officer, operations officer and branch manager.

On June 23, 2010, Sedgwick notified plaintiff that she was not eligible for LTD benefits beyond May 31, 2010, as she no longer met the application definition of Total

-5-

Disability pursuant to the Plan. Sedgwick noted that the only restriction imposed by Dr. Shestak was that plaintiff could not work for four (4) weeks following her elective surgery. However, as Dr. Shestak reported, plaintiff's surgery had not even been scheduled. Sedgwick also discussed the independent reviews conducted by Drs. Chao and Wheatley. After a thorough review of plaintiff's LTD file, and his conference with Dr. Shestak, Dr. Chao found that there was "no evidence that [plaintiff was] unable to work." Lastly, Sedgwick discussed the TSA performed by Intracorp and noted that plaintiff could perform a number of other occupations – such as manager of a financial institution, or a financial operations officer – even with all of her noted restrictions and limitations. As Sedgwick noted, all of the potential occupations considered had a sedentary physical demand level. Based on all of these findings, Sedgwick determined that plaintiff was no longer Totally Disabled as of June 1, 2010. Sedgwick informed plaintiff of her right to appeal within 180 days.

On October 8, 2010, plaintiff, through her attorney, notified Sedgwick that she was appealing the denial of her claim for continued LTD benefits. Plaintiff asked for additional time to review her LTD file and to submit additional information to support her claim. By letter dated October 18, 2010, Sedgwick acknowledged receipt of plaintiff's appeal. On November 10, 2010, Sedgwick granted plaintiff's request for an extension of time to submit information in support of her appeal.

As part of her appeal, the plaintiff submitted treatment notes from Dr. Khurana; treatment notes from Dr. Malik; and a copy of the SSA's September 22, 2008 Order finding

Poznak disabled under the Act. The plaintiff also submitted an unsigned statement, dated December 9, 2010, that discussed her treatment and the impairments that "keep [her] from performing the duties of any gainful occupation." Plaintiff noted that she was "currently undergoing multi-stage procedure breast reconstructive surgery." She discussed the numbness, weakness and "neuropathy" in her upper extremities due to lymphedema in her right arm; chronic pain in her joints; and difficulties with sitting or standing in one position for more than one hour. Plaintiff reported that, because of these symptoms, she was limited in her ability to use a computer and the telephone, as well as in the performance of daily activities such as cooking or carrying groceries. Plaintiff also reported that, because of her headaches and fatigue, she had "a diminished ability to concentrate, organize thoughts, retain information, and communicate effectively," such that it was "impossible to perform gainful employment."

On December 13, 2010, Sedgwick sent plaintiff's entire claim file to NMR, along with the request that it arrange both a medical and mental health review to determine if plaintiff is totally disabled from performing any occupation for which she may be qualified as of June 1, 2010 to the present. NMR, in turn, sent plaintiff's file to Insurance Appeals, Ltd., which requested that two independent, medical experts – Robert Petrie, M.D., who is board-certified in Occupational and Environmental Health; and Marcus Goldman, M.D., who is board-certified in Psychiatry – review plaintiff's LTD file, including all documents submitted in support of her appeal. On December 14, 2010, as part of his occupational medical review, Dr. Petrie spoke with Dr. Malik, who expressed "surprise" that plaintiff was not working.

-7-

Dr. Malik reported that, from his perspective – as plaintiff's neurologist, treating her migraine headaches and carpel tunnel symptoms – "there was no reason why [plaintiff] should not be working. [Dr. Malik] was under the impression that [plaintiff] was working in a bank." Dr. Malik further noted that records from plaintiff's May 27, 2010 visit indicated that she reported approximately three (3) headaches in the past year. Dr. Malik reported that plaintiff was found to have moderate chronic carpel tunnel syndrome on the right, and mild to moderate carpel tunnel syndrome on the left, but this was adequately addressed with night splinting. Dr. Malik felt that plaintiff was not a candidate for injections or surgical intervention.

Dr. Petrie also spoke with plaintiff's other treating physicians, Drs. Khurana, Shestak and Hyland, on December 14, 2010. Dr. Khurana reported that plaintiff had "some generalized complaints after surgery," and he had "nothing to add to what was in his notes." Dr. Shestak reported that he last saw plaintiff on November 2, 2010, when he determined that she would not need any further surgery. Dr. Shestak also noted that plaintiff had developed an infection at her surgical site, but the infection was resolving. Lastly, Dr. Hyland reported that he last saw plaintiff on August 5, 2010, and that she was "disease free" at that time. Petrie reported plaintiff's breast cancer diagnosis, her subsequent treatment and the complications that she encountered. Dr. Petrie noted that plaintiff underwent placement of a silicone prosthesis on June 15, 2010. He also noted that plaintiff developed a draining abscess following her surgery and that the healing process was slow. Nonetheless, Dr. Petrie felt that a one-month period of recovery following plaintiff's surgery was reasonable. As to

plaintiff's carpel tunnel syndrome, Dr. Petrie found that it "would not preclude plaintiff from performing her previous job activities . . . or other jobs for which she is suited." Dr. Petrie found that plaintiff was not disabled from the ability to perform any occupation for which she was qualified for the period from June 1, 2010 through June 14, 2010, and again for the period of July 16, 2010 to the present. Dr. Petrie agreed that plaintiff was disabled from June 15, 2010 through July 15, 2010, or for a one-month period of time following the first phase of her implant surgery.

As part of his psychiatric review, Dr. Goldman attempted to speak with Dr. Khurana on December 15, 2010 and again on December 20, 2010. Dr. Khurana did not return or respond to either of Dr. Goldman's telephone calls. Nonetheless, Dr. Goldman conducted a complete review of plaintiff's LTD claim file, noting that much of the information was related to plaintiff's breast cancer treatment and that there were no mental health notes of any kind. Dr. Goldman noted that during her May 27, 2010 neurological follow-up, plaintiff reported that her medication was helpful and that her headaches were reduced. Further, plaintiff's doctors found her to be alert and oriented; her attention span was intact; her insight and judgment were fair; and she was able to follow multi-step commands. Ultimately, Dr. Goldman found that plaintiff was not disabled from a mental health perspective as of June 1, 2010.

On December 16, 2010, plaintiff's attorney submitted, for the first time, a December 9, 2010 letter from Dr. Khurana in which Dr. Khurana corrected information contained in his previous office notes. Specifically, Dr. Khurana corrected his notes to reflect that plaintiff's

-9-

neurologist, Dr. Malik, prescribed Amitriptyline to treat plaintiff's carpel tunnel symptoms and her headaches, and not to treat depression, as Dr. Khurana's office notes had previously indicated. In closing, Dr. Khurana declared that since plaintiff had been unable to work in the three years since her breast cancer diagnosis, she was "totally and permanently disabled." On December 21, 2010, Sedgwick sent Dr. Khurana's letter to NMR so that it would also be considered as part of plaintiff's appeal. In his December 28, 2010 addendum report, Dr. Petrie found that Dr. Khurana's December 9, 2010 letter did not change his previous opinion, noting no new, objective evidence of impairment. Similarly, Dr. Goldman reported that his psychiatric review was not changed by Dr. Khurana's letter.

On February 4, 2011, Sedgwick informed plaintiff that it was upholding its denial of her claims for continued LTD benefits under the Plan. Specifically, Sedgwick determined that "[a]lthough some findings were referenced, none were . . . so severe as to restrict, limit or otherwise completely prevent [plaintiff] from performing the essential functions of any occupation" as of June 15, 2010.

**Analysis**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Prop., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). The Court considers each party's motion individually to determine if that party has satisfied the summary judgment standard. *In re FedEx Ground Package Sys., Inc.*, 734 F. Supp. 2d 557, 583-84 (N.D. Ind. 2010).

Where, as here, the plan grants the administrator discretion to determine eligibility and construe the plan terms, courts review the administrator's decision under an arbitrary and capricious standard. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009). Courts examine several factors, including the impartiality of the decision making body, the complexity of the issues, the process afforded the parties, the extent to which the decision makers utilized the assistance of experts where necessary, and the soundness of the fiduciary's ratiocination. *Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir. 1999). Absent unusual circumstances, such as fraud or bad faith, a decision to deny benefits is not deemed arbitrary and capricious if it is possible to offer a reasonable explanation for that decision based on the evidence. *Trombetta v. Cragin Fed. Bank for Sav. Emp. Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996). Even so,

-11-

review under this standard is not a "rubber stamp," and courts must not uphold a denial of benefits "when there is an absence of reasoning in the record to support it." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003). For ERISA purposes, the "arbitrary-and-capricious standard" is "synonymous with abuse of discretion." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 767 n.7 (7th Cir. 2010).

The Plan, through a third-party administrator, conducted a thorough review of Poznak's claim, utilizing experts in each of the disciplines that encompassed the various aspects of Poznak's surgeries and treatments for breast cancer. Poznak's treating providers reported that Poznak was "disease-free" and did not need any further surgeries after placement of her silicone prosthesis on June 15, 2010. Plaintiff's neurologist, Dr. Malik, stated that there was "no reason" why plaintiff should not be working. All of the consulting experts ultimately found that Poznak could work, with certain restrictions, and the corresponding TSA (Transferrable Skills Analysis) confirmed that there were available jobs that Poznak could perform given those restrictions. Indeed, the restrictions considered in the TSA – no heavy lifting of more than five (5) pounds and no repetitive motion in her right arm – were more restrictive than the limitations imposed by Ms. Poznak's treating physicians.[1] Therefore, the Plan's denial of benefits was not an abuse of discretion. *See, e.g., Kao v. Aetna Life Ins. Co.*, 647 F. Supp. 2d 397 (D.N.J. 2009) (upholding discontinuance of

---

[1] On February 16, 2010, Dr. Shestak listed plaintiff's restrictions as "no heavy lifting, pushing [or] pulling greater than twenty-five (25) pounds." AR 270. Even Dr. Khurana, who declared Ms. Poznak to be "totally and permanently disabled," stated that Poznak "cannot carry more than 10 pounds." AR 437.

-12-

disability benefits once breast cancer was in remission); *Herman v. Metro. Life Ins. Co.*, 689 F. Supp. 2d 1316 (M.D. Fla. 2010) (same).

Poznak argues that it was an abuse of discretion to favor the opinions of the consulting physicians over her treating physicians. As noted above, Poznak's treating neurologist thought she should be back at work in any event. That matter aside, the Plan wasn't required to adopt Dr. Khurana's conclusory opinion that Poznak was completely and totally disabled. Plan administrators need not give special deference to the opinions of treating physicians. *Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 875 n.7 (7th Cir. 2006) (citing *Black & Decker Dis. Plan v. Nord*, 538 U.S. 822 (2003)). It is also irrelevant that the consulting physicians did not examine Ms. Poznak. "[T]he Seventh Circuit has held that doctors who have not personally examined an employee may rely entirely on paper review. In reviewing medical files, 'doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation.'" *Dreyer v. Metro. Life Ins. Co.*, 459 F. Supp. 2d 675, 682 (N.D. Ill. 2006) (citing *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006)).

Poznak argues that the Plan erred by ignoring her subjective complaints of pain. This is not a case where benefits were denied "solely on the basis that the symptoms of the claimed disability are subjective." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 485 (7th Cir. 2009) (citing *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003)). "A distinction exists . . . between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and how much an

individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007). The Plan administrators did not ignore Poznak's pain symptoms. Rather, the Plan discontinued benefits because Poznak failed to provide evidence that her pain resulted in functional limitations that rendered her disabled. This was not an abuse of discretion. *Williams* at 323 ("Because Williams's functional limitations due to his fatigue could be objectively measured, the Plan did not act arbitrarily and capriciously in denying Williams's initial application or appeal on the basis that the record lacked accurate documentation in this regard"); *Speciale v. Blue Cross & Blue Shield Assoc.*, 538 F.3d 615, 624 (7th Cir. 2008) ("Speciale never produced any objective evidence that her pain caused any functional limitation"); *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 992 (7th Cir. 2005) ("the primary evidence supporting Ruiz's claim that he cannot perform any work for which he is trained was his own subjective complaints of pain"); *Hagopian v. Johnson Fin. Group, Inc. Long-Term Disability Plan*, No. 09-C-926, 2010 WL 3808666, at *11 (E.D. Wis. Sept. 23, 2010) ("Unum denied Hagopian's claim because the [Functional Capacity Evaluation], along with other corroborating evidence, demonstrated that she could perform her prior work at a sedentary level. When informed of this decision, Hagopian failed to provide evidence to the contrary – objective evidence which demonstrated that her 'pain-induced functional limitations' prevented her from performing the material and substantial duties of her occupation"); *Schreiner v. United Wis. Ins. Co.*, 626 F. Supp. 2d 892, 909 (W.D. Wis. 2009) ("It was not unreasonable for defendant to determine that the objective results of the

functional capacity evaluation carried more weight than plaintiff's subjective complaints of pain and her doctors' acceptance of those reports").

Poznak argues that it was arbitrary and capricious for the Plan to rely on the opinion of Dr. Goldman, a psychiatrist, because she was not claiming disability due to a psychiatric condition. This misunderstanding was later clarified by Dr. Khurana during the appeal process. At worst, Dr. Goldman's opinion could be considered irrelevant or superfluous, but considering his opinion was not an abuse of discretion. Every aspect of Ms. Poznak's condition was analyzed by the other independent consultants, so the administrator still "based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Speciale* at 621. Poznak further argues that the administrator used heavy-handed tactics which prevented Poznak from securing all available information in support of her disability. Specifically, Poznak claims that Dr. Goldman threatened to have Poznak's claim dismissed if Dr. Khurana did not return his call the same day, and Dr. Shestak now refuses to deal with Sedgwick and does not want to be involved with Poznak's disability claim. In the absence of some explanation as to what evidence the Plan failed to consider, the Court cannot conclude that these alleged tactics resulted in a failure to consider an "important aspect" of Poznak's disability claim. *Trombetta* at 1438.

Finally, Poznak argues that the denial of benefits must be set aside because Sedgwick inadvertently disclosed personal information – her receipt of SSDI – to two other claimants. Even if this error occurred, it has no bearing on whether Poznak received a "full and fair review" of her claim. *Hackett* at 775 (ERISA requires that specific reasons for the denial be

-15-

communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator) (quoting *Halpin v. W.W. Grainger*, 962 F.2d 685, 688-89 (7th Cir. 1992)); *Schreiner* at 906 ("every procedural defect will not upset a trustee's decision") (quoting *Halpin* at 690).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Plaintiff's motion for leave to file Amended Proposed Findings of Fact [ECF No. 41] is **GRANTED**;

2. Defendant's motion to strike the plaintiff's Amended Proposed Findings of Fact [ECF No. 39] is **DENIED** as moot;

3. Defendant's motion for summary judgment [ECF No. 32] is **GRANTED**;

4. Plaintiff's motion for summary judgment [ECF No. 29] is **DENIED**; and

5. This matter is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 11th day of June, 2012.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**